UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PLANTRONICS, INC.,<br><br>    Plaintiff,<br><br>    v.<br><br>CALLPOD, INC.,<br><br>    Defendant. | Case No. 14-cv-04639-SI<br><br>**ORDER DENYING DEFENDANT'S MOTION TO DISMISS AND GRANTING DEFENDANT'S MOTION TO STAY**<br><br>Re: Dkt. 19 |

Defendant's motion to dismiss or stay is scheduled for a hearing on January 23, 2015. Pursuant to Civil Local Rule 7-1(b), the Court finds this matter appropriate for resolution without oral argument and hereby VACATES the hearing. For the reasons set forth below, the Court DENIES the motion to dismiss, GRANTS the motion to stay, and STAYS the action pending further order of the Court.

**BACKGROUND**

Plaintiff Plantronics Inc. filed this declaratory judgment suit on October 17, 2014. The complaint seeks a declaration of noninfringement and invalidity of five patents owned by defendant Callpod Inc.[1] According to Callpod, the five patents are closely related and cover "mobile conferencing" technology. Guccione Decl. ¶ 13. On October 16, 2014, Plantronics filed petitions at the United States Patent & Trademark Office for *inter partes* review of each claim in the '250, '758, '445, and '624 patents.

---

[1] The patents-in-suit are United States Patent Nos. 6,801,611 ("the '611 patent"); 7,707,250 ("the '250 patent"); 7,742,758 ("the '758 patent"); 7,899,445 ("the '445 patent"); and 7,945,624 ("the '624 patent")

This lawsuit was filed after negotiations between the parties broke down. Those negotiations began nearly a decade ago, on October 27, 2005, when Callpod first contacted Plantronics "to explore potential synergies" relating to the incorporation of Callpod's mobile conferencing technology into Plantronics' product line. Guccione Decl. ¶ 3, Ex. A. In 2006, the parties entered into a non-disclosure agreement (NDA) and Callpod submitted a proposal; however, Plantronics concluded it was not interested. Guccione Decl. ¶ 4, Ex. B; deVilliers Decl. ¶ 3. Callpod again wrote to Plantronics in 2010, stating that Callpod was "divesting its hardware business" in the mobile conferencing space and "taking final bids." Guccione Decl. ¶ 5, Ex. C. In response to the email, Plantronics declined to make an offer to purchase the patents. Guccione Decl. ¶ 6, Ex. D. RPX, a third party representing Callpod, contacted Plantronics in late 2013, indicating that Callpod sought to sell its patent portfolio. deVilliers Decl. ¶ 4. Shortly thereafter, the parties entered into another NDA effective December 30, 2013, to "explore a potential transaction" involving certain Callpod patents. Guccione Decl. ¶ 7, Ex. E. RPX provided information to Plantronics that revealed that in 2011 Callpod brought an infringement suit involving the '250 patent against GN Netcom, a Callpod competitor. deVilliers Decl. ¶ 6. Plantronics also learned that Callpod had sued GN Netcom in 2006, alleging infringement of the '611 patent. *Id.*

In January 2014, Plantronics made a verbal offer to purchase the Callpod patents for $25,000. deVilliers Decl. ¶ 7. Subject to the NDA, Callpod's CEO visited Plantronics' headquarters in April 2014, to see if the parties could reach an agreement. deVilliers Decl. ¶ 11. During the meeting the parties discussed "technical features of certain Plantronics' products as they allegedly related to Callpod's patents. . . ." deVilliers Decl. ¶ 13. Plantronics' Chief IP Counsel "was left without any doubt that Callpod had . . . prepared claims charts mapping Callpod's patents to Plantronics' products, and was alleging that Plantronics' products infringed one or more of Callpod's patents." deVilliers Decl. ¶ 12. After the April meeting, Plantronics had a "firm conviction that a lawsuit alleging infringement of one or more of the Callpod patents was inevitable." deVilliers Decl. ¶ 15. Regarding these contentions, Callpod's CEO asserts that he did "not recall any instance . . . in which Callpod ever identified a specific claim of any Callpod patent

that it contended was being infringed by any specific Plantronics product," nor did he recall "ever provid[ing] Plantronics with a claim chart detailing the application of any Callpod patent to any Plantronics product. . . ." Guccione Decl. ¶ 12. Callpod emailed Plantronics on July 7, 2014, stating that the $25,000 offer "simply does nothing more than invite an expensive litigation" and that for Plantronics to acquire Callpod's patents is "far more important than simply avoiding a litigation where the costs will be multiples higher than the [$3.5 million] purchase price." Guccione Decl. ¶ 8, Ex. F. In the July 7, 2014 email, marked "For Settlement Purposes Only," Callpod stated that if Plantronics did not purchase the assets, Callpod would sell the patents to a non-practicing entity (NPE), who would, "without question, file suit against Plantronics based on the legal analysis performed by Callpod's counsel. To be clear, Plantronics does infringe on several of Callpod's mobile conferencing patents. Further, Callpod has a history with Plantronics that supports . . . willful infringement claim(s)." *Id.*

On August 6, 2014, Callpod informed Plantronics that it was rejecting Plantronics' $250,000 offer to purchase the IP assets. Guccione Decl. ¶ 9, Ex. G. This email, as well as Callpod's subsequent emails, was marked "For Settlement Purposes Under FRE 408." *Id.* In the August 6, 2014 email, Callpod asserted that Plantronics "clearly made a threat of litigation against Callpod" and that to protect Callpod's interests, Callpod had "prepared a detailed complaint against Plantronics which [Callpod] will file should [Plantronics] threaten [Callpod] again or should Plantronics file a DJ action against [Callpod]." *Id.* Callpod also rescinded the offer to sell, instead offering to license Callpod's patents for $1.625 million. *Id.* Callpod wrote that "Plantronics will spend multiples of [$1.625 million] in litigation costs" and "will be facing a material risk of loss related to economic damages for prior infringement notwithstanding its risk pursuant to any willful infringement claim(s)." *Id.* Plantronics responded on August 9, 2014, denying it had threatened litigation against Callpod and asserting that the asking price was "absolutely stratospheric in relation to the nominal value of the patents and the fact that we are therefore talking about the value of litigation avoidance." Guccione Decl. ¶ 10, Ex. H. On the same day, Callpod replied that "[Plantronics will] spend far more that [sic] in the first year of a litigation" and Callpod "[had] a strong contingency-based law firm who has run the gauntlet on

3

1  due diligence for our legal positions." deVilliers Decl. ¶ 18, Ex. 4. On August 16, 2014,
2  Plantronics informed Callpod that "[Plantronics] would prefer to buy the patents" as opposed to a
3  license and raised its offer to $325k, "a massive increase given the absence of value." Guccione
4  Decl. ¶ 11, Ex. I. On September 12, 2014, Callpod notified Plantronics that it had rejected the
5  offer and engaged ICAP, a third party patent brokerage, to auction Callpod's IP assets in
6  November 2014. Guccione Decl. ¶ 13, Ex. J. A few days later, Plantronics wrote to ICAP that it
7  "may be interested in bidding on Callpod's IP" and requested the reserve price. Schmidt Decl. ¶
8  2, Ex. A. ICAP replied with "initial bidding guidance . . . set at low to mid 7 figures." Schmidt
9  Decl. ¶ 3, Ex. B.

10  On October 16, 2014, Plantronics filed petitions for *inter partes* review of four of the five
11  patents-in-suit, and then filed this suit on the following day. Guccione Decl. ¶ 15. In response to
12  the filings, Callpod contacted Plantronics on October 17, 2014, in an attempt "to structure a
13  license that is mutually beneficial." Guccione Decl. ¶ 16, Ex. L. On October 19, 2014,
14  Plantronics responded that its previous $250,000 offer "isn't appropriate - it is now too high. . . .
15  [T]he value of the patents is now impaired for all to see." Guccione Decl. ¶ 17, Ex. M. As an
16  alternative to litigation, Plantronics asked that Callpod "make a more compelling proposal, offer
17  us a royalty free license, and request that we withdraw our filing in return." *Id.* ICAP notified
18  Callpod that the sale of Callpod's IP assets was "all but impossible at the present time" and
19  formally terminated the auction. Guccione Decl. ¶ 18, Ex. N.

**DISCUSSION**

**I.     Dismissal**

Defendant Callpod moves to dismiss this declaratory judgment suit for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). Callpod argues that no real, immediate controversy exists between the parties regarding these five patents sufficient to sustain declaratory judgment jurisdiction. If this Court denies the motion to dismiss, Callpod alternatively requests this matter be stayed in its entirety pending resolution of the four petitions for *inter partes* review. Plantronics opposes dismissal but does not oppose a stay.

4

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The dispute, however, must be "real and substantial" and "definite and concrete, touching the legal relations of parties having adverse legal interests[.]" *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007). A district court must ask "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id*. (citations omitted). To determine whether jurisdiction exists, the party invoking jurisdiction must point to "some affirmative act by the patentee" that forms the basis for an actual controversy between the parties. *Prasco, LLC v. Medicis Pharm. Corp*., 537 F.3d 1329, 1338-39 (Fed. Cir. 2008). The "affirmative act" necessary to sustain declaratory judgment jurisdiction can arise in "a variety of ways, for example, by creating a reasonable apprehension of an infringement suit . . . demanding the right to royalty payments, . . . or creating a barrier to the regulatory approval of a product that is necessary for marketing." *Id*. at 1339; *but see Trend Micro Corp. v. Whitecell Software, Inc.*, No. C-10-02248-WHA, 2011 WL 499951, at *3 (N.D. Cal. Feb. 8, 2011) (finding lack of declaratory judgment jurisdiction where defendant patent holder "has not made any claim that [plaintiff] infringes" its patent, has not "threatened or otherwise communicated" with plaintiff regarding infringement of that patent, and has "not even performed an infringement analysis to determine whether any" of plaintiff's products may infringe the patent).

Defendant argues that there is no definite and immediate controversy between the parties with respect to any of the patents-in-suit because prior to filing the complaint, Plantronics was aware of Callpod's plans to auction the patents-in-suit in November 2014. Callpod also contends that the lack of a dispute is demonstrated by the history of the parties' negotiations because Callpod never identified any specific Plantronics product as infringing any particular Callpod patent.

The Court finds that, on the record before it, Plantronics has demonstrated a real and

definite dispute between the parties sufficient to confer declaratory judgment jurisdiction over Plantronics's non-infringement claims as to the patents-in-suit. After unsuccessful negotiations over a course of years, in late 2013, Callpod again contacted Plantronics offering to sell its patent portfolio. deVilliers Decl. ¶ 4. Plantronics had learned that Callpod filed suit in 2006 and 2011 against a Plantronics competitor for infringing the '611 and '250 patents-in-suit, respectively. deVilliers Decl. ¶ 6. After Plantronics offered $25,000 to purchase Callpod's patents, the parties met in April 2014 where they discussed "technical features of certain Plantronics' products as they allegedly related to Callpod's patents," and Plantronics "was left without any doubt" that Callpod had prepared claim charts, was alleging infringement, and that a lawsuit was "inevitable." deVilliers Decl. ¶¶ 11, 12, 15. Further, Callpod notified Plantronics that it had "prepared a detailed complaint" and that Plantronics would spend several million dollars in litigation costs, in addition to risking "any willful infringement claims." Guccione Decl. ¶ 9, Ex. G. Callpod also responded to Plantronics' $25,000 offer by stating that it "simply does nothing more than invite an expensive litigation" and "[t]o be clear, Plantronics does infringe on several of Callpod's mobile conferencing patents." Guccione Decl. ¶ 8, Ex. F. Much of this correspondence from Callpod was labeled "For Settlement Purposes Under FRE 408." This conduct all indicates that a real, immediate case or controversy exists. *See*, *e.g.*, *Hewlett-Packard Co. v. Acceleron LLC*, 587 F.3d 1358, 1363 (Fed. Cir. 2009) ("Of course, if a party has actually been charged with infringement of the patent, there is *necessarily*, a case or controversy adequate to support declaratory judgment jurisdiction.").

Callpod asserts that there is no real and immediate case or controversy because Plantronics was aware of Callpod's forthcoming auction of the patents-in-suit. However, Callpod also notified Plantronics that it was "taking final bids" on its mobile conferencing patents in 2010, yet sued a Plantronics competitor in 2011 for infringing one of the Callpod patents-in-suit. *See* Guccione Decl. ¶ 5, Ex. C; deVilliers Decl. ¶ 6. Thus, Callpod's past actions suggest that even with a pending auction, future infringement litigation could reasonably be expected to occur. *See Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 727 (2013) ("[A] defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the

allegedly wrongful behavior could not reasonably be expected to recur."). Though Callpod states that it did not provide a claim chart or identify a specific claim of any patent that it contended was being infringed by any specific Plantronics product, these acts are not required to establish a real and definite dispute between the parties to confer declaratory judgment. The "affirmative act" by the patentee forming the basis for an actual controversy can arise in a variety of ways; nonetheless, Callpod's emails, sent three months before this Complaint was filed, made explicit infringement allegations that establish declaratory judgment jurisdiction.

Callpod requests that even if this Court finds that an actual case or controversy exists, it should exercise its discretion to dismiss the case. *See EMC Corp. v. Norand Corp.*, 89 F.3d 807, 810 (Fed. Cir. 1996) (even if "there is an actual controversy, the district court is not required to exercise declaratory judgment jurisdiction, but has discretion to decline that jurisdiction."), *overruled in part on other grounds*, *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007). Callpod argues that the parties were involved in active negotiations at the time this suit was filed and that Plantronics' complaint for declaratory judgment was filed for an improper purpose to force Callpod into a disparate bargaining position and/or to adversely impact Callpod's scheduled auction of the patents-in-suit. Callpod argues that this case is similar to *EMC v. Norand Corporation*, in which the Federal Circuit affirmed the discretionary dismissal of a declaratory judgment lawsuit. In that case, Norand, the patentee, and EMC, a manufacturer of disk drive systems, were involved in negotiations over the sale or licensing of Norand's patents up to the time that the complaint was filed. *EMC*, 89 F.3d at 814. At a third meeting, Norand informed EMC that it would enter negotiations with six EMC competitors, and the parties confirmed plans for a fourth meeting. *Id.* at 809. Three days later, EMC filed a declaratory judgment action, which Norand moved to dismiss. *Id*. EMC claimed that Norand made explicit infringement charges at the meetings, while Norand denied that it made any such claims or threatened suit. *Id*. The district court exercised its discretion and dismissed the case, finding that at the time the lawsuit was filed, the parties were still in active license or sale negotiations, and that Norand was considering entering negotiations with others as well. *Id*. at 810. The Federal Circuit affirmed, finding that the district court did not abuse its discretion by dismissing the case.

7

> The circumstances surrounding and immediately following the filing of the complaint lend further support to the district court's decision not to exercise its jurisdiction in this case. The complaint was filed shortly after Norand informed EMC of its plans to enter negotiations with EMC's competitors. The day after the complaint was filed, EMC's senior intellectual property counsel called Norand's outside patent counsel and explained that the declaratory judgment complaint had been filed as "merely a defensive step" and that EMC "would like to continue to discuss with you all the options hopefully in a more meaningful manner over the near term." By way of explaining why the complaint was filed, EMC's counsel added that EMC's management decided to file suit because "they just thought it was in their interest to protect themselves first and continue discussions." Under these circumstances, the district court could properly view the declaratory judgment complaint as a tactical measure filed in order to improve EMC's posture in the ongoing negotiations-not a purpose that the Declaratory Judgment Act was designed to serve.

*Id*. at 815.

The Court finds that *EMC* is distinguishable. Unlike the negotiations in *EMC*, the negotiations between Callpod and Plantronics were not active at the time this complaint was filed. The record shows that Plantronics repeatedly rejected Callpod's offers and stated its view that Callpod's patents were not worth much, and throughout the parties' negotiations, the parties' positions were very far apart. Further, there is no evidence that Callpod was actively negotiating with any other parties at the time this lawsuit was filed.[1]

The Court agrees with Plantronics that this case is more similar to *Sony Electronics, Inc. v. Guardian Media Technologies, Ltd.*, 497 F.3d 1271 (Fed. Cir. 2007). In *Sony*, Sony filed a complaint for declaratory judgment after Guardian, the defendant and patent owner, alleged that Sony infringed Guardian's patents. *Sony,* 497 F.3d at 1285. In meetings between the parties, Sony maintained that the Guardian patents were invalid, and after filing the complaint, Sony also filed a request for reexamination of the patents. *Id.* The district court dismissed Sony's complaint, finding that no actual controversy existed and stating that even if it did have jurisdiction, the court would exercise its discretion to decline jurisdiction because the jurisdictional question was close and the facts created an appearance that Sony filed the lawsuit to gain leverage in the negotiations. *Id.* at 1281. The Federal Circuit reversed, finding that there was

---

[1] The parties dispute whether the auction reserve price was reasonable.

8

an actual controversy between the parties, and remanded to the district court to reconsider the discretionary dismissal. *Id.* at 1289-90. The court noted that it was "troubled by several aspects of the second reason underlying the district court's decision to decline jurisdiction: its belief that 'the facts as a whole create an appearance that Plaintiffs filed these lawsuits as an intimidation tactic to gain leverage in the licensing negotiations.'"

> Unlike in *EMC*, there is no affirmative evidence to suggest that appellants filed this suit in order to obtain a more favorable bargaining position in any ongoing license negotiations. In addition, while this litigation may have had the effect of weakening Guardian's bargaining position relative to third parties, we do not think it appropriate to infer that appellants, therefore, filed this suit as an intimidation tactic to gain leverage in any future negotiations with Guardian. Similarly, we do not think it appropriate under the circumstances of this case to draw any inference from appellants' decisions to file these lawsuits simultaneously. Even if these suits have had the effect of placing appellants in a more favorable negotiating position, that effect is not a sufficient reason to decline to hear the suit.

*Id.* at 1289.

Here, like *Sony*, there is an actual controversy between the Plantronics and Callpod because Callpod made several direct and indirect threats of litigation. In light of the parties' history of negotiations, the Court cannot conclude that Plantronics' statement that "the value of the patents is now impaired for all to see" is necessarily affirmative evidence of a motive to obtain a more favorable bargaining position. Further, the fact that a lawsuit has the effect of placing the plaintiff in a more favorable negotiating position "is not a sufficient reason to decline to hear the suit." *Id*.

## II.   Stay

Alternatively, defendant moves to stay this case pending resolution of Plantronics' *inter partes* review petitions. Prior to filing this suit, Plantronics filed petitions for *inter partes* review with respect to each claim in the '250, '758, '445, and '624 patents. As a result, this case must be stayed at least with respect to those four patents. 35 U.S.C. § 315(a)(2) ("If the petitioner or real party in interest files a civil action challenging the validity of a claim of the patent on or after the date on which the petitioner files a petition for *inter partes* review of the patent, that civil action

shall be automatically stayed."). The parties agree, and this Court concurs, that it is in the interest of judicial economy to stay this case in its entirety, including with respect to the '611 patent-in-suit, because the five patents are closely related and similarly directed to mobile conferencing technology.

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby DENIES defendant's motion to dismiss and STAYS this action pending *inter partes* review of the '250, '758, '445, and '624 patents. Docket No. 19.

**The parties are ORDERED to file a joint Status Report on the progress of the IPR every 90 days, and are further ORDERED to inform the Court promptly when the PTO takes action on the IPR.**

**IT IS SO ORDERED**.

Dated: January 21, 2015

SUSAN ILLSTON
United States District Judge